**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

**MARY FORREST,**

        **Plaintiff,**

**v.**                     **Case No. 06-C-298**

**JP MORGAN CHASE BANK, N.A.,**

        **Defendant.**

## DECISION AND ORDER

This matter comes before the Court on J.P. Morgan Chase Bank's ("Chase") motion to dismiss Mary Forrest's ("Forrest") complaint alleging violations of the Fair Credit Reporting Act ("FCRA"). After a stay pending the Supreme Court's ruling in *Safeco Ins. Co. of Am. v. Burr*, — U.S. —, 127 S. Ct. 2201 (2007), the Court re-opened the case and directed further briefing in light of *Safeco*. Those briefs were submitted, and the motion is now ready for decision. For the reasons that follow, Chase's motion is granted.[1]

### BACKGROUND

In September 2005, Forrest received a mailer (or series of mailings) from Chase offering real-estate secured credit. (Docket No. 1, Complaint, Exhibit A). The first page of the mailer noted a "Potential Credit Amount" of $65,621, based on the "average line of credit amount funded by Chase," which "may vary depending on your available equity Line subject to approval." (Docket No. 1, p. 7). The mailer also states that home equity lines are available up

---

[1] Both parties filed a variety of motions to provide supplemental authority in support of their respective positions. *See* Docket Nos. 22, 23, 27, 34, 41. The Court granted two of these motions previously (Docket Nos. 25, 26). The pending motions to supplement are also granted. All of the supplemental authority was reviewed and considered by the Court.

to $350,000.  (*Id.*)  The mailer further states that Forrest is "Pre-Qualified" for the line of credit, with "lower variable rates, as low as Prime minus .51%, currently 5.49% APR."  (*Id.*)

The reverse side of the first page (Docket No. 1, p. 8), under the heading "**IMPORTANT INFORMATION**," states that Forrest received the offer "based on information in your credit report indicating that you meet certain criteria."  It further states that the amount of the credit line "for which you qualify depends on your annual gross income and the available equity in your home," and provides a range of rates linked to the U.S. prime rate (from 5.49% to 11.00%) for the proposed credit line.  (*Id.*)  It explains that "the offer is not guaranteed if you do not meet our criteria including providing acceptable property as collateral."  (*Id.*)

The second and third parts of Exhibit A are nearly identical to each other.  (Docket No. 1, pp. 10-11, 12-13).  The front side is in the form of a letter offering Forrest credit based on her home equity.  It states that Forrest is "pre-qualified" for a loan of "up to $100,000 or more" and directs her to "Please see reverse side for details."  (*Id.*, pp. 10, 12).  The reverse side, under the heading "\***IMPORTANT PROGRAM INFORMATION**," states that Forrest received the offer because Chase "believe[s] you satisfy Chase's criteria for creditworthiness."  It also indicates that the minimum amount of the home loan being offered is $15,000 (or $10,000 in Michigan).

## ANALYSIS

To survive a motion to dismiss, a complaint must contain factual allegations which are "enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. ----, 127 S. Ct. 1955, 1965 (2007).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not

need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1964-65. Because the mailer at issue was attached to the complaint as an exhibit, the Court may consider it as part of the pleadings. *See Centers v. Centennial Mortg., Inc.*, 398 F.3d 930, 933 (7th Cir. 2005) ("[A] plaintiff may plead himself out of court by attaching documents to the complaint that indicate that he or she is not entitled to relief").

Forrest alleges that Chase did not have a permissible purpose under the FCRA to access her credit report because the mailer did not contain a "firm offer of credit." Forrest also alleges that the violation was "willful," in which case she would be entitled to actual, statutory (from $100 to $1000), and punitive damages. *See* 15 U.S.C. § 1681n(a).[2]

## I. Firm Offer of Credit under the FCRA

The term "firm offer of credit" is defined in the FCRA as "any offer of credit or insurance to a consumer that will be honored if the consumer is determined, based on information in a consumer report on the consumer, to meet the specific criteria used to select the consumer for the offer." 15 U.S.C. § 1681a(l). The term "firm offer" as used in the FCRA is in some ways a misnomer, because the offer may be conditioned on three specific requirements. *See* § 1681a(l)(1-3).[3] Therefore, a "firm offer of credit" under the FCRA "really means 'firm offer

---

[2] Forrest's complaint is a putative class action, but she has not moved for class certification.

[3] First, the creditor may apply additional pre-selected criteria bearing on the consumer's creditworthiness. Second, the firm offer may be conditioned on verification that the consumer continues to meet the specific criteria used to select the consumer for the offer. Third, the offer may be conditioned on the consumer furnishing any collateral that was both established and disclosed to the consumer before selection of the consumer for the offer.

-3-

if you meet certain criteria.'" *Kennedy v. Chase Manhattan Bank USA, NA*, 369 F.3d 833, 841 (5th Cir. 2004), *cert. denied*, 543 U.S. 995 (2004).

To qualify for the firm offer of credit exception, an offer must have "sufficient value for the consumer to justify the absence of the statutory protection of his privacy." *Cole v. U.S. Capital, Inc.*, 389 F.3d 719, 726 (7th Cir. 2004). This is because "an offer of credit without value is the equivalent of an advertisement or solicitation. It is clear that Congress did not intend to allow access to consumer credit information 'for catalogs and sales pitches.'" *Id.* at 727 (quoting *Trans Union Corp. v. FTC*, 267 F.3d 1138, 1143 (D.C. Cir. 2001)). Still, the exception reflects a balance between the "privacy concerns created by pre-screening" and "the benefit of a firm offer of credit or insurance for all consumers identified through the screening process." *Cole*, 389 F.3d at 725. "Congress apparently believes that people are more willing to reveal personal information in return for guaranteed offers of credit than for catalog and sales pitches." *Trans Union Corp.*, 267 F.3d at 1143.

To determine whether an offer of credit has value and qualifies for the exception, *Cole* instructs courts to examine the following factors: (1) whether it appears likely that the offer would be honored; (2) whether the material terms of the offer are adequately disclosed; and (3) whether the amount of credit being offered is minimal or subject to so many limitations that it is of little value. *See Zawacki v. Goal Financial, LLC*, 483 F. Supp. 2d 653, 656 (N.D. Ill. 2007 (citing *Cole*, 389 F.3d at 727-28). These factors are considered together; no single factor is determinative. *See Zawacki*, 483 F. Supp. 2d at 656 (citing *Cole* at 727-28 and *Perry v. First Nat'l Bank*, 459 F.3d 816, 824-25 (7th Cir. 2006)).

The following analysis demonstrates that the offer had value and qualifies as a firm offer of credit under the FCRA.

### 1. Likelihood that the offer would be honored

First, it appears likely that Chase's offer of credit to Forrest would have been honored. The mailer repeatedly states that Forrest is "pre-qualified" for a home equity line of credit. *See, e.g., Perry*, 459 F.3d at 825 (holding that a credit card solicitation qualified as a firm offer of credit in part because it was "clear from the face of [the] solicitation that recipients are pre-approved"). This is in contrast to the mailer in *Cole*, which expressly stated that "[g]uaranteed approval is neither express nor implied" and therefore "create[d] a question whether the offer of credit w[ould] be honored." *See Cole*, 389 F.3d at 728. Of course, the offer in the instant case was conditioned upon Forrest's ability to furnish "acceptable property" as collateral, but this is expressly allowed by the FCRA and does not affect whether the mailer qualifies as a "firm offer of credit." 15 U.S.C. § 1681a(l)(3).

Forrest argues that she should be entitled to discovery on the issue of whether Chase would have honored its offer of credit. At this juncture, the Court is obviously confined to the pleadings, including the terms of the mailer itself, and Forrest does not allege that the offer was unlikely to be honored. Also, the terms of the mailer suggest that Chase would have honored its offer of credit. This is relevant in determining, as a matter of law, whether Chase's solicitation qualifies as a "firm offer of credit." *See Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 956 (7th Cir. 2006) (determining whether offer has value depends on the "terms of the offer, not on recipients' idiosyncratic circumstances").

-5-
Case 2:06-cv-00298-RTR   Filed 09/21/07   Page 5 of 9   Document 43

### 2. Disclosure of material terms

Forrest alleges that the mailer was a "sham offer" and a solicitation because it does not state a minimum amount of credit or a repayment term. A variety of numbers are mentioned in the mailer, but the mailing does indicate that the minimum amount of credit being offered is $15,000 (or $10,000 in Michigan). (*See* Docket No. 1, p. 11, "Withdrawal of Offer" section); *see also Soroka v. JP Morgan Chase & Co.*, — F. Supp. 2d —, No. 05 Civ. 7578(DAB), 2007 WL 895249 at *5 (S.D.N.Y.) (examining identical language, which indicates that the "offer is clearly for a minimum loan of '$15,000 (or $10,000 in MI)'").

Forrest is correct that the repayment terms are uncertain, as the offer gives only a range of possible interest rates (5.49% to 11.00%). Forrest insists that this omission is fatal under *Cole*, but "the presence of a precise interest rate and other materials is just one of several factors to take into consideration." *Murray v. HSBC Auto Finance, Inc.*, No. 05-C-4040, 2006 WL 2861954 at *4 (citing *Perry*, 459 F.3d at 824-25). Accordingly, in the wake of *Cole*, numerous courts hold that the absence of material terms (like repayment terms or the minimum amount of credit) does *not* automatically remove a loan solicitation from the statutory definition of a firm offer of credit. *See Murray* at *4 ("nothing in the text or legislative history of § 1681n requires HSBC to include the specific terms of the loan"); *Poehl v. Countrywide Home Loans, Inc.*, 464 F. Supp. 2d 882, 884 (E.D. Mo. 2006) ("Congress . . . did not specify what, if any, credit terms had to be included for something to be a 'firm offer'"); *Soroka* at *4 ("As for plaintiff's complaint that the offer lacked terms such as the applicable interest rate and repayment period,

the FCRA simply does not require that such terms be included in firm offers of credit made pursuant to the statute").

Moreover, "[e]very consumer and every lender has a common understanding that home loans are made for a definite period of time, that banks charge interest for lending money, and that interest rates are subject to change." *Poehl*, 464 F. Supp. 2d at 886 (quoting *Soroka v. Homeowner's Loan Corp.*, Case No. 8:05 CV 2029 T 17MAP, 2006 WL 4031347 (M.D. Fla.) at *4). The interest rate for a home equity loan depends on a variety of factors, including market conditions, credit history, and the value of the property used as collateral. *See Homeowner's Loan* at *4. Therefore, in the context of real-estate secured credit, it is nearly impossible for creditors to provide more definitive credit terms in their initial communications.

Finally, despite the lack of material terms, the solicitation identifies how the consumer can obtain additional information about the terms of the loan. *See* Docket No. 1, p. 7 ("For fastest service, have your offer number ready and call 1-800-820-0329 or stop by any of our 1,800 convenient branches. Or apply online at www.chase.com/homeequity"); *compare Homeowner's Loan* at *4 ("the solicitation identifies two means to obtain additional information, by phone or the internet"). Therefore, while the precise terms of the offer "were not disclosed on the face of the offer, the material terms were ascertainable with minimal effort." *Homeowner's Loan* at *5.

### 3. Amount of credit being offered

In *Cole*, the Seventh Circuit held that an offer of $300 in credit towards the purchase of a car did not have value, in part because "the relatively small amount of credit combined with the known limitations of the offer – that it must be used to purchase a vehicle – raises a question

-7-

whether the offer has value to the consumer." *Cole*, 389 F.3d at 728. Here, the amount of credit offered by Chase – a minimum of $15,000, a maximum of $350,000, and an "average amount" of $65,621 – is easily distinguishable from the $300 in *Cole* as an amount with value. *See, e.g., Poehl*, 464 F. Supp. 2d at 887 (offer for home loan of $93,500 "based on an office average of actual loans issued" is an "indication that the actual value will be more than a nominal amount").

Further, an important consideration in *Cole* was that the credit offered could only be used towards the purchase of a car. This point was highlighted by *Perry*, which noted that a credit card offer with an extremely low credit limit ($250) could be used "to purchase any products or services for which Visa is accepted. This is in stark contrast to the credit offered in *Cole*, which could be used only toward the purchase of a vehicle at a particular car dealership. In *Cole*, the cost of purchasing a vehicle dwarfed the value of the credit offer." 459 F.3d at 825. Here, as in *Perry*, the credit extended by Chase could have been used to purchase anything, not just a car.

## II. Willful violation

As noted above, this case was stayed for a period of time pending the Supreme Court's recent ruling in *Safeco*. *Safeco* resolved a circuit split on the standard used to determine whether a violation of the FCRA is "willful." The distinction is important because a willful violation opens the door to statutory damages, an inviting scenario in the context of a proposed class action. *See Murray*, 434 F.3d at 953 ("That actual loss is small and hard to quantify is why statutes such as the [FCRA] provide for modest [*i.e.* statutory] damages without proof of injury").

In *Safeco*, the Supreme Court concluded that a defendant willfully violates the FCRA if it acts in "reckless disregard" of the FCRA's obligations. 127 S. Ct. at 2209-10. Thus, a

-8-

violation is not willful "unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 2215. There is no willful violation if the defendant's "reading of the statute, albeit erroneous, was not objectively unreasonable." *Id.*

Obviously, the Court finds that Chase's reading of the statute is the correct one. Even if the Court is wrong and Chase's mailer is not a "firm offer of credit" as defined by the FCRA, Chase's actions were not objectively unreasonable. The centerpiece of Forrest's argument is the lack of material terms in Chase's mailer, but as noted above, despite the holding in *Cole*, numerous courts hold that the FCRA imposes no such requirement. This precludes a finding of willfulness in the instant case. *See Safeco*, 127 S. Ct. at 2215-16 ("While we disagree with Safeco's analysis, we recognize that its reading has a foundation in the statutory text, and a sufficiently convincing justification to have persuaded the District Court to adopt it and rule in Safeco's favor").

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

1. Chase's motion to dismiss [Docket No. 15] is **GRANTED**; and

2. This matter is **DISMISSED** in its entirety.

Dated at Milwaukee, Wisconsin, this 20th day of September, 2007.

                               **SO ORDERED,**

                               **s/ Rudolph T. Randa**
                               **HON. RUDOLPH T. RANDA**
                               **Chief Judge**